# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
x------------------------------------------------------------------x

TIG INSURANCE COMPANY,

                                    Plaintiff,

            -against-

THE FAIRCHILD CORPORATION and NATIONAL
UNION FIRE INSURANCE COMPANY OF
PITTSBURGH, PA,

                                    Defendants.
x------------------------------------------------------------------x

Civil Action No.: 07civ8250
ECF Case (JGK)

**COMPLAINT FOR
DECLARATORY RELIEF**

Plaintiff, TIG INSURANCE COMPANY ("TIG"), by its attorneys Carroll, McNulty &
Kull L.L.C., as and for its Complaint for Declaratory Relief against Defendants, The Fairchild
Corporation ("Fairchild") and National Union Fire Insurance Company of Pittsburgh, PA
("National Union"), alleges as follows:

## THE PARTIES

1.      Plaintiff TIG is a California corporation with its principal place of business in
Manchester, New Hampshire.  At all relevant times, TIG was and is authorized to do business in
the State of New York.

2.      Defendant Fairchild is a Delaware corporation with its principal place of business
in McLean, Virginia.  At all relevant times, Fairchild was and is authorized to do business in the
State of New York.

3.      Defendant National Union is a Pennsylvania corporation with its principal place
of business in New York, New York.    At all relevant times, National Union was and is
authorized to issue policies of insurance in the State of New York.

## JURISDICTION & VENUE

4.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.00, exclusive of costs.

5.      Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(a) and (c) in that National Union maintains its principal place of business within the Southern District of New York and the Defendants are subject to personal jurisdiction in this District.

## CLAIM FOR DECLARATORY RELIEF

6.      This is an action for declaratory judgment pursuant to 28 U.S.C. § 2201 for the purpose of determining a question in actual controversy between the parties.

7.      There is a real, substantial and justiciable issue in controversy between the parties hereto with respect to the existence of insurance coverage available to Fairchild.

8.      A judicial determination and a declaration of the rights and obligations of the parties is necessary and appropriate at this time because TIG has no adequate remedy at law which will resolve the current controversy.

## THE POLICIES

**A.      The National Union Primary Policies**

9.      Relevant to this matter, National Union issued primary commercial general liability insurance policies to Fairchild under policy numbers: RM GL 4600361 for the policy period January 1, 1990 through January 1, 1991 and extended by endorsement until July 1, 1991; RM GL 3252851 for the policy period July 1, 1991 through July 1, 1992; RM GL 3264872 for the policy period July 1, 1992 through July 1, 1993; RM GL 1759381 for the policy period July

2

1, 1993 through July 1, 1994; RM GL 3198253 for the policy period July 1, 1994 through July 1, 1995; RM GL 1212529 for the policy period July 1, 1995 through July 1, 1996 and extended by endorsement until October 1, 1996; RM GL 1437913 for the policy period October 1, 1996 through October 1, 1997 (the "National Union Primary Policies").

10.    Upon information and belief, the National Union Primary Policies were issued from National Union's New York, New York office located at 70 Pine Street through a New York broker.

11.    The National Union Primary Policies issued from January 1, 1990 through October 1, 1996 provide limits of $1 million each occurrence, $5 million general aggregate and $2 million products/completed operations aggregate.

12.    The National Union Primary Policies issued from January 1, 1990 through October 1, 1996 contain the following "Anti-Stacking Endorsement:"

ANTI-STACKING ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Section IV. – Commercial General Liability Conditions, is amended to add:

10.    If this Coverage Form and any other Coverage Form or policy issued to you by us or any of our affiliated companies apply to the same "occurrence", the maximum limit of insurance under all the Coverage Forms or policies will not exceed the highest applicable limit of insurance available under any one Coverage Form or policy. This condition does not apply to any other Coverage Form or policy issued by us or any of our affiliated companies specifically to apply as excess insurance over this Coverage Form.

13.    The National Union Primary Policy issued from October 1, 1996 through October 1, 1997 provides limits of $1 million per occurrence, $2 million general aggregate and $2 million products/completed operations aggregate.

**B.    The TIG Excess Policies**

14.    TIG issued excess liability insurance policies to Fairchild under policy numbers: XLB9151959 for the policy period July 1, 1995 through July 1, 1996 and extended by endorsement to October 1, 1996, with policy limits of $25 million per occurrence and in the aggregate excess of $10,000 Self-Insured Retention Limit, as well as excess of the National Union primary insurance coverage limits of $1 million each occurrence, $5 million general aggregate and $2 million products/completed operations aggregate; and XLB9152271 for policy period October 1, 1996 through October 1, 1997, with policy limits of $25 million per occurrence and in the aggregate excess of the National Union primary insurance limits of $1 million per occurrence, $2 million general aggregate and $2 million products/completed operations aggregate (the "TIG Excess Policies").

15.    The TIG Excess Policies were issued from TIG's New York, New York office located at 40 Fulton Street through a New York broker.

16.    The TIG Excess Policies contain the following Insuring Agreement:

SECTION I – INSURING AGREEMENTS

    A.    COVERAGE

    WE will pay on YOUR behalf the sums that YOU shall become legally obligated to pay as damages because of PERSONAL INJURY, PROPERTY DAMAGE, or ADVERTISING INJURY, caused by an OCCURRENCE to which this policy applies during this POLICY PERIOD.  The OCCURRENCE must take place in the COVERAGE TERRITORY.

    B.    LIMITS OF INSURANCE

4

WE shall be liable only for that portion of the ULTIMATE NET LOSS in excess of:

1.  The applicable limits of the UNDERLYING INSURANCE listed in the attached Schedule of UNDERLYING INSURANCE (whether such insurance is collectible or not); or

2.  With respect to an OCCURRENCE for which no UNDERLYING INSURANCE applies and to which this policy applies, the greater of either:

    a.  The applicable limit or limits of liability of any OTHER INSURANCE available to YOU; or

    b.  The amount stated in the Declarations as the INSURED'S RETAINED LIMIT.

Regardless of the number of persons and organizations who are INSUREDS under this policy, and regardless of the number of claims made or suits brought against any or all INSUREDS, on account of PERSONAL INJURY, PROPERTY DAMAGE, or ADVERTISING INJURY, the total limits of OUR liability for ULTIMATE NET LOSS resulting from any one OCCURRENCE shall not exceed the amount stated as the each OCCURRENCE limit in the Declarations.

Subject to the provision respecting any one OCCURRENCE, when the underlying policies listed in the Schedule of UNDERLYING INSURANCE or any OTHER INSURANCE available to YOU and to which this policy applies provide coverage(s) which are subject to an aggregate limit of liability for all covered damages, OUR liability shall likewise be limited to the amount stated in the Declarations as the aggregated limit for ULTIMATE NET LOSS rising out of one or more OCCURRENCES while this policy is in force commencing from its effective date.  If the aggregate limits of liability under any UNDERLYING INSURANCE are reduced or exhausted solely by reason of losses paid there under arising out of OCCURRENCES which take place during OUR POLICY PERIOD, then this policy shall:

1.  in the event of reduction, pay the excess of the reduced underlying limit;

2.  in the event of exhaustion continue in force as UNDERLYING INSURANCE.

The aggregate limit of this policy shall apply separately to (i) the PRODUCTS-COMPLETED OPERATIONS HAZARD as defined in this policy and (ii) any other coverage in which the UNDERLYING INSURANCE provides an aggregate

limit. If the UNDERLYING INSURANCE does not provide an aggregate limit for coverage(s), OUR liability for ULTIMATE NET LOSS (except for the PRODUCTS – COMPLETED OPERATIONS HAZARD as referred to in "i" above) is likewise not subject to an aggregate limit for all insured damages for such coverage(s).

The limits of insurance apply separately to each consecutive annual period and to any remaining period of less than twelve (12) months, starting with the beginning of the POLICY PERIOD shown in the Declarations. Should the POLICY PERIOD be extended after the policy effective date for an additional period of less than twelve (12) months, the additional period will be deemed part of the preceding period for the purposes of determining the limits of insurance.

C.    DEFENSE PROVISIONS AND SUPPLEMENTAL PAYMENTS

1.    DEFENSE PROVISIONS

    a.    With respect to any OCCURRENCE covered by the UNDERLYING INSURANCE listed in the Schedule of UNDERLYING INSURANCE or any OTHER INSURANCE available to YOU and to which this policy applies, WE shall not be called upon to assume charge of the investigation, settlement or defense of any claim made or SUIT brought against YOU, but WE shall have the right and be given the opportunity to be associated in the defense and trial of any claims or suits relative to any OCCURRENCE which, in OUR opinion, may create liability on the part of US under the terms of this policy.

    b.    With respect to any OCCURRENCE (1) not covered by the UNDERLYING INSURANCE or any OTHER INSURANCE available to YOU, or (2) unavailable because of the exhaustion of aggregate limits of insurance, but covered by the terms and conditions of this policy, WE shall defend such SUIT against YOU seeking damages on account of PERSONAL INJURY, PROPERTY DAMAGE, or ADVERTISING INJURY and WE may make such investigation and effect settlement of any claim or SUIT so defended.

    WE shall not be obligated to defend any SUIT after the applicable limits of this policy have been exhausted by payment of the ULTIMATE NET LOSS.

17.    The TIG Excess Policies also include the relevant definitions:

    SECTION III – DEFINITIONS

\*     \*     \*

I.    OCCURRENCE means an accident including continuous or repeated exposure to substantially the same general harmful conditions.

\*     \*     \*

M.    OTHER INSURANCE means insurance, other than UNDERLYING INSURANCE, which has been provided to YOU and affords coverage with respect to injury or damage to which this policy also applies.

N.    PERSONAL INJURY means:

1.  Bodily injury, sickness or disease sustained by a person including death resulting from any of these at any time;

O.    POLICY PERIOD means the period stated in the Declarations of this policy.

\*     \*     \*

Q.    PRODUCTS – COMPLETED OPERATIONS HAZARD includes:

1.    All PERSONAL INJURY and PROPERTY DAMAGE occurring away from premises YOU own or rent and arising out of YOUR PRODUCT or YOUR WORK except:

a.    products that are still in YOUR physical possession;

b.    work that has not yet been completed or abandoned.

\*     \*     \*

T.    SUIT means a civil proceeding in which damages to which this policy applies are alleged.

\*     \*     \*

U.    ULTIMATE NET LOSS means the amount of the principal sum, award or verdict actually paid or payable in cash in the settlement or satisfaction of claims for which the INSURED is liable, either by adjudication or compromise with the written consent of US, after making proper deduction for all recoveries and salvages.

V.    UNDERLYING INSURANCE means the policy or policies of insurance as described in the Schedule of Underlying Insurance forming a part of this policy.

\*    \*    \*

Y.    YOUR PRODUCT means:

1.    Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed by:

a.    YOU;

b.    Other trading under YOUR name; or

c.    A person or organization whose BUSINESS or assets YOU have acquired; and

2.    Containers (other than vehicles), materials, parts, or equipment furnished in connection with such goods or products.

YOUR PRODUCT includes warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of YOUR PRODUCT; and the providing of or failure to provide warnings or instructions.

YOUR PRODUCT does not include vending machines or other property rented to or located for the use of others but not sold.

18.    In addition, the TIG Excess Policies contain the following relevant conditions:

SECTION IV – CONDITIONS

\*    \*    \*

F.    DUTIES IN THE EVENT OF OCCURRENCE, CLAIM OR SUIT

1.    YOU must see to it that WE receive prompt written notice of an OCCURRENCE which may result in a claim.  Notice should include:

a.    How, when and where the OCCURRENCE took place;

8

        b.     The names and addresses of any injured persons and witnesses.

2.     If a claim is made or SUIT brought against YOU, YOU must see to it that WE receive prompt written notice of the claim or SUIT.

3.     YOU and any other involved INSURED must:

        b.     Immediately send US copies of any demands, notices, summons or legal papers received in connection with the claim or SUIT;

        c.     Authorize US to obtain records or other information;

        d.     Cooperate with US in the investigation, settlement or defense of the claim or SUIT;

        e.     Assist US, upon OUR request, in the enforcement of any right against any person or organizations which may be liable to YOU because of injury or damage to which this policy may also apply.

4.     YOU shall not make or authorize in admission of liability or attempt to settle or otherwise dispose of any claim or SUIT without OUR written consent.

\*      \*      \*

I.     MAINTENANCE OF UNDERLYING INSURANCE

The policy or policies referred to in the Declarations and Schedule of UNDERLYING INSURANCE or renewals or replacements thereof not more restrictive in coverage shall be maintained in full effect during this POLICY PERIOD, except for any reduction in the aggregate limits solely by payment of claims and/or claims expense.

If such UNDERLYING INSURANCE is not maintained in full effect by YOU, or if any limits of liability of UNDERLYING INSURANCE are:

1.     less than as stated in the Schedule of UNDERLYING INSURANCE; or

2.     unavailable to YOU due to bankruptcy or insolvency of an underlying insurer; or

3.     if there is any material change in the coverage of any UNDERLYING INSURANCE;

Then the insurance afforded by this policy shall apply in the same manner as if such UNDERLYING INSURANCE and limits of liability had been in effect, available, so maintained and unchanged.

J.    OTHER INSURANCE

If OTHER INSURANCE, whether collectible or not, is available to YOU covering a loss also covered by this policy, other than a policy that is specifically written to apply in excess of this policy, the insurance afforded by this policy shall apply in excess of and shall not contribute with such OTHER INSURANCE.

\*    \*    \*

## FACTUAL BACKGROUND

**A.    Distribution of the Jiffy Air Profiler**

19.    Upon information and belief, Fairchild purchased VSI Corporation in 1980.

20.    At the time of Fairchild's purchase, D-M-E Company ("D-M-E") was a division of VSI Corporation.

21.    Among other products, D-M-E distributed a reciprocating hand tool that was used in the mold and die industry and known as the Jiffy Air Profiler.

22.    Fairchild, through D-M-E, distributed the Jiffy Air Profiler from 1987 through 1996.

23.    On January 23, 1996, Fairchild entered into an Asset Purchase Agreement with Milacron, Inc. ("Milacron") whereby Milacron purchased the assets of D-M-E.

24.    Thereafter, Milacron formed a free-standing corporation named D-M-E Company, which continued to distribute the Jiffy Air Profiler from 1996 through April 2004.

10

**B.     The Missouri Actions**

25.     In January 2002, fourteen product liability actions were filed separately in the United States District Court for the Eastern District of Missouri, Eastern Division, naming D-M-E as the sole defendant (the "Missouri Actions").

26.     The plaintiffs in the Missouri Actions alleged exposure to the Jiffy Air Profiler from approximately 1987 through 2003 and claimed that the product was defective because it subjected the user to dangerous and damaging levels of vibrations that resulted in personal injuries.

27.     After litigating the Missouri Actions for over two years, on January 29, 2004, Milacron notified Fairchild of the Missouri Actions and sought defense and indemnification pursuant to the Asset Purchase Agreement as well as statutory contribution.

28.     From April 2004 through August 2004 a series of mediations took place in the Missouri Actions.

29.     Without Fairchild's participation, Milacron unilaterally settled all of the claims pending in the Missouri Actions for a total of $5.8 million.

**C.     The Milacron Action**

30.     On or about May 24, 2004, Milacron commenced a lawsuit captioned *Milacron, Inc., f/k/a Cincinnati Milacron v. The Fairchild Corporation and RHI Holdings, Inc.* (the "Milacron Action"), Case Number A0404162 in the Court of Common Pleas, Hamilton County, Ohio. See First Amended Complaint, attached as Exhibit A.

31.     On or about October 19, 2004, Fairchild filed a Third-Party Complaint in the Milacron Action against its primary insurers, American International Group, Inc., National Union Fire Insurance Company of Pittsburgh, PA, Insurance Company of the State of Pennsylvania,

Zurich American Insurance Company, Royal & SunAlliance USA and The Hartford Fire Insurance Company in the Milacron Action seeking a declaration as to insurance coverage.

32.     On October 16, 2006, a bench trial was held in the Milacron Action before the Honorable Steven E. Martin.

**D.      Notice to TIG**

33.     By correspondence dated December 1, 2006, Fairchild notified TIG of the Missouri Actions.

34.     By correspondence dated December 29, 2006, TIG issued a complete reservation of rights with respect to coverage for the Missouri Actions and requested additional information from Fairchild to assist in its investigation of those claims, including, but not limited to, copies of all pleadings referenced in Fairchild's December 1, 2006 correspondence.

35.     Fairchild failed to provide the requested information to TIG until on or about July 24, 2007.

36.     In addition, Fairchild did not notify TIG of the Milacron Action until July 2007.

**E.      Judgment in the Milacron Action**

37.     By letter dated July 12, 2007, Judge Martin issued a decision in the Milacron Action, finding that Fairchild owed Milacron statutory contribution for the settlements in the Missouri Actions and allocating such contribution pursuant to Milacron's proposed methodology, which held Fairchild 100% liable for the injuries sustained prior to 1997 (one year after the sale of D-M-E) and 50% liable for injuries sustained thereafter. See July 12, 2007 Letter Decision, attached as Exhibit B.

38.    Pursuant to the foregoing allocation model, Judge Martin proposed a total judgment against Fairchild in the amount of $3,346,346.13, plus prejudgment interest of $598,535.93, as well as post-judgment interest and court costs (the "Milacron Judgment").

39.    For the period from January 1, 1990 through October 1, 1996, the court allocated a total contribution amount of $1,911,739.09.

40.    Upon information and belief, the Milacron Judgment was to be entered on or about August 10, 2007.

**F.    TIG Denial of Coverage**

41.    By correspondence dated July 24, 2007, Fairchild demanded that TIG contribute a pro rata portion of the Milacron Judgment under the TIG excess policies.  See July 24, 2007 Letter and Allocation Charts, attached as Exhibit C.

42.    Specifically, Fairchild contended that the $1,911,739.09 judgment amount attributed to the January 1, 1990 through October 1, 1996 policy periods should be allocated as follows: 1) $250,000 to Fairchild pursuant to its self-insured retention under the National Union Primary Policies; 2) $750,000 to National Union under its Primary Policies; and 3) $911,739.09 to Fairchild's excess carriers, including TIG.  See Exhibit C.

43.    Upon information and belief, Fairchild's request for contribution from Fairchild's excess carriers was based upon the assumption that the "Anti-Stacking Endorsement" in the National Union primary policies issued from January 1, 1990 through October 1, 1996 limited National Union's exposure during that time period to a single, $1 million per occurrence policy limit, which was subject to a self-insured retention of $250,000.

44.    By correspondence dated July 24, 2007, TIG disclaimed coverage for the claims arising in the Missouri Action based upon Fairchild's failure to demonstrate that the limits of all

13

underlying insurance and other insurance had been completely and properly exhausted. See July 24, 2007 Disclaimer, attached as Exhibit D.

45. TIG further reserved its rights on a variety of other policy terms and conditions, including, but not limited to, Fairchild's failure to provide timely notice of the underlying claims to TIG and that TIG has no obligation to provide coverage for personal injury occurring before the inception or after the expiration of the TIG excess policies. See Exhibit D.

### AS AND FOR A FIRST CAUSE OF ACTION AGAINST FAIRCHILD
#### (Declaratory Judgment as to TIG's Obligations)

46. TIG repeats and realleges each and every allegation set forth in paragraphs 1 through 45, inclusive, with the same force and effect as if fully set forth herein.

47. The Insuring Agreement of the TIG Excess Policies states that TIG "shall be liable only for that portion of the ULTIMATE NET LOSS in excess of . . . [t]he applicable limits of the UNDERLYING INSURANCE listed in the attached Schedule of UNDERLYING INSURANCE (whether such insurance is collectible or not)."

48. Moreover, a condition precedent to coverage under the TIG Excess Policies is the proper and complete exhaustion of the primary coverage issued by National Union.

49. As such, the TIG Excess Policies only provide coverage to Fairchild in excess of the $1 million per occurrence limit and/or $5 million general aggregate limit (July 1, 1995 – October 1, 1996) or $2 million general aggregate (October 1, 1996 – October 1, 1997) of the National Union Primary Policies.

50. As evidenced by the terms and conditions of the TIG Excess Policies, TIG issued excess coverage to Fairchild with the understanding and expectation that such policies were in excess of a $1 million  per occurrence limit and/or a $5 million general aggregate limit (July 1,

1995 – October 1, 1996) or $2 million general aggregate (October 1, 1996 – October 1, 1997) for each applicable policy period, whether such insurance was collectible or not.

51.     Fairchild has failed to demonstrate that the $1 million per occurrence limits and/or $5 million general aggregate limit (January 1, 1990 – October 1, 1996) or $2 million general aggregate (October 1, 1996 – October 1, 1997) of the National Union Primary Policies have been properly exhausted by the Milacron Judgment, which allocated only $1,911,739.09 for the entire January 1, 1990 through October 1, 1996 period and $271,446.88 for the October 1, 1996 through October 1, 1997 period.

52.     In particular, as demonstrated by Fairchild's proposed allocation of the Milacron Judgment by year, the total payment that National Union would be required to make on behalf of Fairchild for any given policy period would not exceed the $1 million per occurrence limit under the National Union Primary Policies. See Allocation Chart by Year, attached as Exhibit C.

53.     Due to Fairchild's failure to demonstrate that the "Underlying Insurance" has exhausted, coverage is not triggered under the TIG Excess Policies.

54.     By reason of the foregoing, TIG seeks and is entitled to a declaration that TIG has no obligation to indemnify Fairchild for any portion of the Milacron Judgment.

55.     TIG has no adequate remedy at law.

**WHEREFORE**, Plaintiff TIG prays for judgment in its favor and against Defendant Fairchild as set forth below.

15

## AS AND FOR A SECOND CAUSE OF ACTION AGAINST FAIRCHILD
### (Timing of Personal Injury)

56.     TIG repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 55, inclusive, with the same force and effect as if fully set forth herein at length.

57.     The TIG Excess Policies provide coverage for sums Fairchild becomes legally obligated to pay as damages because of "PERSONAL INJURY, PROPERTY DAMAGE, or ADVERTISING INJURY, caused by an OCCURRENCE to which this policy applies during this POLICY PERIOD."

58.     TIG Excess Policy XLB 9151959 has an effective period of July 1, 1995 through July 1, 1996 and was extended by endorsement until October 1, 1996.

59.     TIG Excess Policy XLB 9152271 has an effective period of October 1, 1996 through October 1, 1997.

60.     According to the plain language of the TIG Excess Policies, TIG will only be responsible for damages arising from personal injury caused by an occurrence during the policy periods from July 1, 1995 through October 1, 1997.

61.     Fairchild bears the burden of demonstrating the claims forming the basis of the Missouri Actions were caused by an occurrence during the TIG Excess Policy periods.

62.     Fairchild has failed to establish that it was legally obligated to pay damages due to personal injury caused by an occurrence during the TIG policy periods.

63.     As a result, TIG seeks and is entitled to a declaration that TIG has no obligation to indemnify Fairchild for any portion of the Milacron Judgment attributed to personal injury claims occurring outside of the TIG policy periods.

64.    TIG has no adequate remedy at law.

**WHEREFORE**, Plaintiff TIG prays for judgment in its favor and against Defendant Fairchild as set forth below.

### AS AND FOR A THIRD CAUSE OF ACTION AGAINST FAIRCHILD
**(Late Notice)**

65.    TIG repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 64, inclusive, with the same force and effect as if fully set forth herein at length.

66.    As a condition of the TIG Excess Policies, Fairchild must provide prompt written notice of an occurrence which may result in a claim, and include in such notice how, when and where the occurrence took place, as well as the names and addresses of any injured persons or witnesses.

67.    Similarly, in the event a claim or suit is made against Fairchild, Fairchild must immediately send TIG copies of any demands, notices, summons or legal papers received in connection with the claim or suit and cooperate with TIG in the investigation, settlement or defense of the claim or suit.

68.    The TIG Excess Policies further require that the insured shall not make any admission of liability or attempt to settle or dispose of any suit without TIG's written consent.

69.    Fairchild received notice of the Missouri Actions, and a claim for defense and indemnification by Milacron, on or about January 29, 2004.

70.    In addition, the Milacron Action was filed against Fairchild on or about May 24, 2004.

71.     Fairchild failed to notify TIG of the existence of the Missouri Actions until on or about December 1, 2006, nearly three years after Fairchild received notice of such lawsuits by Milacron and nearly two and a half years after the Missouri Actions had been settled by Milacron.

72.     Moreover, Fairchild's December 1, 2006 correspondence failed to specify the details of those actions or to provide copies of the underlying pleadings as required under the TIG Excess Policies.

73.     At that time, Fairchild further failed to notify TIG of the pending Milacron Action or to advise TIG that its policies could potentially be implicated by a judgment in the Milacron Action.

74.     In July 2007, Fairchild disclosed to TIG for the first time the existence of the Milacron Action, the proposed entry of a $3.3 million judgment against Fairchild and the fact that Fairchild was negotiating a settlement with its primary insurers that could potentially implicate the TIG Excess Policies.

75.     By letter dated July 24, 2007, Fairchild demanded that TIG indemnify Fairchild for a pro rata portion of the Milacron Judgment under the TIG Excess Policies.

76.     Fairchild's delay in providing TIG with notice of the Missouri and Milacron Actions and the potential implication of the TIG Excess Policies constitutes a material breach of the notice provision in the TIG Excess Policies.

77.     As a result, TIG seeks and is entitled to a declaration that due to Fairchild's failure to perform its obligations under the TIG Excess Policies, TIG is not obligated to indemnify Fairchild for any portion of the Milacron Judgment.

78.     TIG has no adequate remedy at law.

**WHEREFORE,** Plaintiff TIG prays for judgment in its favor and against Defendant Fairchild as set forth below.

## AS AND FOR A FIRST CAUSE OF ACTION AGAINST NATIONAL UNION
### (Declaratory Judgment as to TIG's Obligations)

79.    TIG repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 78, inclusive, with the same force and effect as if fully set forth herein at length.

80.    The Insuring Agreement of the TIG Excess Policies states that TIG "shall be liable only for that portion of the ULTIMATE NET LOSS in excess of . . . [t]he applicable limits of the UNDERLYING INSURANCE listed in the attached Schedule of UNDERLYING INSURANCE (whether such insurance is collectible or not)."

81.    Moreover, a condition precedent to coverage under the TIG Excess Policies is the proper and complete exhaustion of the primary coverage issued by National Union.

82.    As such, the TIG Excess Policies only provide coverage to Fairchild in excess of the $1 million per occurrence limit and/or $5 million general aggregate limit (July 1, 1995 – October 1, 1996) or $2 million general aggregate (October 1, 1996 – October 1, 1997) of the National Union Primary Policies.

83.    As evidenced by the terms and conditions of the TIG Excess Policies, TIG issued excess coverage to Fairchild with the understanding and expectation that such policies were in excess of a $1 million  per occurrence limit and/or a $5 million general aggregate limit (July 1, 1995 – October 1, 1996) or $2 million general aggregate (October 1, 1996 – October 1, 1997) for each applicable policy period, whether such insurance was collectible or not.

19

84.     National Union has failed to properly exhaust the $1 million per occurrence limits and/or $5 million general aggregate limit (January 1, 1990 – October 1, 1996) or $2 million general aggregate (October 1, 1996 – October 1, 1997) of the National Union Primary Policies.

85.     In particular, as demonstrated by Fairchild's proposed allocation of the Milacron Judgment by year, the total payment that National Union would be required to make on behalf of Fairchild for any given policy period would not exceed the $1 million per occurrence limit under the National Union Primary Policies. See Allocation Chart by Year, attached as Exhibit C.

86.     Due to National Union's failure to properly exhaust its limits, coverage is not triggered under the TIG Excess Policies.

87.     By reason of the foregoing, TIG seeks and is entitled to a declaration that the National Union policies have not been properly exhausted and, therefore, TIG has no obligation to indemnify Fairchild for any portion of the Milacron Judgment.

88.     TIG has no adequate remedy at law.

**WHEREFORE**, Plaintiff TIG Insurance Company prays for judgment in its favor and against Defendants Fairchild Corporation and National Union Fire Insurance Company of Pittsburgh, PA as follows:

(a)     For a declaration that TIG has no obligation to indemnify Fairchild for any portion of the Milacron Judgment;

(b)     For a declaration that the National Union Primary Policies have not been properly exhausted by the Milacron Judgment;

(c)     For a declaration that TIG has no obligation to indemnify Fairchild for any portion of the Milacron Judgment based upon Fairchild's failure to provide timely notice to TIG;

(d)    For a declaration that TIG has no obligation to indemnify Fairchild for any portion of the Milacron Judgment arising out of personal injury claims that did not occur within the TIG policy periods;

(e)    For its attorneys' fees and costs pursuant to law; and

(f)    For such other relief as is just and equitable herein.

Dated: September 20, 2007
      New York, New York

CARROLL, McNULTY & KULL L.L.C.
Attorneys for Plaintiff
TIG Insurance Company

Kristin V. Gallagher [KG 6820]
Eileen de Callies [ED 2938]
570 Lexington Avenue, 10th Floor
New York, New York 10022
(212) 252-0004