UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
x------------------------------------------------------------------x
TIG INSURANCE COMPANY,                           Civil Action No.:  07civ8250
                                                 ECF Case (JGK)
                                    Plaintiff,

             -against-


THE FAIRCHILD CORPORATION and NATIONAL
UNION FIRE INSURANCE COMPANY OF
PITTSBURGH, PA,

                                    Defendants.
x------------------------------------------------------------------x


### PLAINTIFF TIG INSURANCE COMPANY'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR STAY THE ACTION


On the Brief:

        Kristin V. Gallagher
        Eileen de Callies

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................1

I.     STATEMENT OF FACTS AND PROCEDURAL HISTORY.........................2

      A.    The National Union Primary Policies ...........................................2

      B.    The TIG Excess Policies ................................................................3

      C.    Distribution Of The Jiffy Air Profiler ..........................................10

      D.    The Missouri Actions....................................................................10

      E.    The Milacron Action.....................................................................11

      F.    Notice To TIG..............................................................................11

      G.    Judgment In The Milacron Action ...............................................12

      H.    TIG's Disclaimer Of Coverage ....................................................12

      I.    The New York Declaratory Judgment Action ..............................13

      J.    The Ohio Declaratory Judgment Action ......................................14

II.    LEGAL ARGUMENT ...............................................................................14

      A.    A Dismissal Or Stay Is Not Warranted Under *Wilton* ................15

      B.    Abstention Is Not Warranted Under *Colorado River* ..................17

CONCLUSION....................................................................................................21

## TABLE OF AUTHORITIES

**Cases**

Alabama Pub. Serv. Comm'n. v. Southern R. Co.,
341 U.S. 341 (1951)..................................................................................17

Allstate Ins. Co. v. Valley Physical Medicine &
Rehabilitation, P.C., 475 F.Supp.2d 213 (E.D.N.Y., 2007)........................................15

Brillhart v. Excess Ins. Co. of America,
316 U.S. 491, 62 S.Ct. 1173 (1942)..........................................................14, 15

Caisse Nationale de Credit Agricole v. Bank
of Tokyo-Mitsubishi Trust Co., 1997 WL 345216 (S.D.N.Y., 1997) .......................15

Colorado River Water Conservation Dist. v. U.S.,
424 U.S. 800, 96 S.Ct. 1236 (1976)..........................................................passim

General Star Int'l. Indem. Ltd., v. Chase Manhattan Bank,
2002 WL 850012 (S.D.N.Y., 2002)..............................................................18

In re Asbestos Litig., 963 F.Supp. 247 (S.D.N.Y., 1995)............................................19

Manna v. Greenburgh #11 School Dist.,
2 F.Supp.2d 461, 467 (S.D.N.Y., 1998)..........................................................15

Moses H. Cone Memorial Hosp. v. Mercury Const. Corp.,
460 U.S. 1 (1983)................................................................................15, 20

Pro-Fac Co-op, Inc. v. Alpha Nursery, Inc.,
205 F.Supp.2d 90 (W.D.N.Y., 2002)............................................................16

Youell v. Exxon Corp., 74 F.3d 373, 375 (2d Cir., 1996) ...........................................15

Village of Westfield v. Welch's,
170 F.3d 116, 124-25 (2d Cir., 1999) ..............................................15, 18, 19, 20

Wilton v. Seven Falls Co., 515 U.S. 277,
115 S.Ct. 2137 (1995).........................................................................14, 15, 17

Plaintiff TIG Insurance Company ("TIG") submits this Memorandum of Law in opposition to Defendants' motion to dismiss or, in the alternative, to stay the action *sub judice* based upon the doctrine of abstention. [1]

## PRELIMINARY STATEMENT

Defendants' motion to dismiss must be denied in its entirety, as Defendants have failed to demonstrate that a dismissal or abstention is warranted. As will be set forth more fully below, TIG filed this action in New York seeking declaratory relief against The Fairchild Corporation ("Fairchild") and one of its primary insurers, National Union Fire Insurance Company of Pittsburgh, PA ("National Union"). Thereafter, Fairchild and RHI filed a second third-party complaint in the Court of Common Pleas located in Hamilton County, Ohio (the "Ohio Action"), seeking a declaration as to the obligations of each primary, excess and/or umbrella insurance carrier that had issued policies to Fairchild, including TIG. However, there is only one discrete issue at the center of this action and, as respects TIG, National Union, and Fairchild, the Ohio Action – the interpretation and application of the National Union policies' Anti-Stacking Endorsement.

As a result, the action *sub judice* will adequately address the same matter that is at issue in the Ohio Action and will afford a complete and fair determination of the rights between Fairchild, National Union, and TIG. Indeed, dismissing this action and requiring TIG to remain a part of the multi-party Ohio Action would force TIG to unnecessarily litigate issues that are immaterial to the singular issue over which it is in dispute with Fairchild. Thus, to dismiss the present action or alternatively grant a stay in order to permit Fairchild to proceed with the later-filed Ohio Action against TIG would be a waste of both

---

[1] On or about December 10, 2007, The Fairchild Corporation moved to dismiss or, in the alternative, stay this action. On or about January 7, 2008, National Union Fire Insurance Company of Pittsburgh PA joined the motion.

judicial and private resources, while also risking dissimilar decisions by the two courts. TIG therefore respectfully requests that this Court retain jurisdiction over this matter and deny Defendants' motion in its entirety.

## I.    STATEMENT OF FACTS AND PROCEDURAL HISTORY

### A.    The National Union Primary Policies

Relevant to this matter, National Union issued primary commercial general liability insurance policies to Fairchild under policy numbers: RM GL 4600361 for the policy period January 1, 1990 through January 1, 1991 and extended by endorsement until July 1, 1991; RM GL 3252851 for the policy period July 1, 1991 through July 1, 1992; RM GL 3264872 for the policy period July 1, 1992 through July 1, 1993; RM GL 1759381 for the policy period July 1, 1993 through July 1, 1994; RM GL 3198253 for the policy period July 1, 1994 through July 1, 1995; RM GL 1212529 for the policy period July 1, 1995 through July 1, 1996 and extended by endorsement until October 1, 1996; RM GL 1437913 for the policy period October 1, 1996 through October 1, 1997  (the "National Union Primary Policies").

Upon information and belief, the National Union Primary Policies were issued from National Union's New York, New York office located at 70 Pine Street through a New York broker.  The National Union Primary Policies issued from January 1, 1990 through October 1, 1996 provide limits of $1 million each occurrence, $5 million general aggregate and $2 million products/completed operations aggregate.

The National Union Primary Policies issued from January 1, 1990 through October 1, 1996 contain the following "Anti-Stacking Endorsement:"

ANTI-STACKING ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Section IV. – Commercial General Liability Conditions, is amended to add:

> 10.    If this Coverage Form and any other Coverage Form or policy issued to you by us or any of our affiliated companies apply to the same "occurrence", the maximum limit of insurance under all the Coverage Forms or policies will not exceed the highest applicable limit of insurance available under any one Coverage Form or policy. This condition does not apply to any other Coverage Form or policy issued by us or any of our affiliated companies specifically to apply as excess insurance over this Coverage Form.

The National Union Primary Policy issued from October 1, 1996 through October 1, 1997 provides limits of $1 million per occurrence, $2 million general aggregate and $2 million products/completed operations aggregate.

**B.    The TIG Excess Policies**

TIG issued excess liability insurance policies to Fairchild under policy numbers: XLB9151959 for the policy period July 1, 1995 through July 1, 1996 and extended by endorsement to October 1, 1996, with policy limits of $25 million per occurrence and in the aggregate excess of $10,000 Self-Insured Retention Limit, as well as excess of the National Union primary insurance coverage limits of $1 million each occurrence, $5 million general aggregate and $2 million products/completed operations aggregate; and XLB9152271 for policy period October 1, 1996 through October 1, 1997, with policy limits of $25 million per occurrence and in the aggregate excess of the National Union primary insurance limits of $1 million per occurrence, $2 million general aggregate and $2 million products/completed operations aggregate (the "TIG Excess Policies"). The TIG

Excess Policies were issued from TIG's New York, New York office located at 40 Fulton Street through a New York broker.

The TIG Excess Policies contain the following Insuring Agreement, which states, in part:

SECTION I – INSURING AGREEMENTS

    A.    COVERAGE

WE will pay on YOUR behalf the sums that YOU shall become legally obligated to pay as damages because of PERSONAL INJURY, PROPERTY DAMAGE, or ADVERTISING INJURY, caused by an OCCURRENCE to which this policy applies during this POLICY PERIOD. The OCCURRENCE must take place in the COVERAGE TERRITORY.

    B.    LIMITS OF INSURANCE

WE shall be liable only for that portion of the ULTIMATE NET LOSS in excess of:

1.    The applicable limits of the UNDERLYING INSURANCE listed in the attached Schedule of UNDERLYING INSURANCE (whether such insurance is collectible or not); or

2.    With respect to an OCCURRENCE for which no UNDERLYING INSURANCE applies and to which this policy applies, the greater of either:

    a.    The applicable limit or limits of liability of any OTHER INSURANCE available to YOU; or

    b.    The amount stated in the Declarations as the INSURED'S RETAINED LIMIT.

Regardless of the number of persons and organizations who are INSUREDS under this policy, and regardless of the number of claims made or suits brought against any or all INSUREDS, on account of PERSONAL INJURY, PROPERTY DAMAGE, or ADVERTISING INJURY, the total limits of OUR liability for ULTIMATE NET LOSS resulting from any one OCCURRENCE shall not exceed the amount stated as the each OCCURRENCE limit in the Declarations.

Subject to the provision respecting any one OCCURRENCE, when the underlying policies listed in the Schedule of UNDERLYING INSURANCE or any OTHER INSURANCE available to YOU and to which this policy applies provide coverage(s) which are subject to an aggregate limit of liability for all covered damages, OUR liability shall likewise be limited to the amount stated in the Declarations as the aggregated limit for ULTIMATE NET LOSS rising out of one or more OCCURRENCES while this policy is in force commencing from its effective date.  If the aggregate limits of liability under any UNDERLYING INSURANCE are reduced or exhausted solely by reason of losses paid there under arising out of OCCURRENCES which take place during OUR POLICY PERIOD, then this policy shall:

1.      in the event of reduction, pay the excess of the reduced underlying limit;

2.      in the event of exhaustion continue in force as UNDERLYING INSURANCE.

The aggregate limit of this policy shall apply separately to (i) the PRODUCTS-COMPLETED OPERATIONS HAZARD as defined in this policy and (ii) any other coverage in which the UNDERLYING INSURANCE provides an aggregate limit.   If the UNDERLYING INSURANCE does not provide an aggregate limit for coverage(s), OUR liability for ULTIMATE NET LOSS (except for the PRODUCTS – COMPLETED OPERATIONS HAZARD as referred to in "i" above) is likewise not subject to an aggregate limit for all insured damages for such coverage(s).

The limits of insurance apply separately to each consecutive annual period and to any remaining period of less than twelve (12) months, starting with the beginning of the POLICY PERIOD shown in the Declarations.  Should the POLICY PERIOD be extended after the policy effective date for an additional period of less than twelve (12) months, the additional period will be deemed part of the preceding period for the purposes of determining the limits of insurance.

C.      DEFENSE PROVISIONS AND SUPPLEMENTAL PAYMENTS

1.      DEFENSE PROVISIONS

        a.      With respect to any OCCURRENCE covered by the UNDERLYING INSURANCE listed in the Schedule of UNDERLYING INSURANCE or any OTHER INSURANCE available to YOU and to which this policy applies, WE shall not be called upon to assume charge of the

investigation, settlement or defense of any claim made or SUIT brought against YOU, but WE shall have the right and be given the opportunity to be associated in the defense and trial of any claims or suits relative to any OCCURRENCE which, in OUR opinion, may create liability on the part of US under the terms of this policy.

b.    With respect to any OCCURRENCE (1) not covered by the UNDERLYING INSURANCE or any OTHER INSURANCE available to YOU, or (2) unavailable because of the exhaustion of aggregate limits of insurance, but covered by the terms and conditions of this policy, WE shall defend such SUIT against YOU seeking damages on account of PERSONAL INJURY, PROPERTY DAMAGE, or ADVERTISING INJURY and WE may make such investigation and effect settlement of any claim or SUIT so defended.

WE shall not be obligated to defend any SUIT after the applicable limits of this policy have been exhausted by payment of the ULTIMATE NET LOSS.

Furthermore, the TIG Excess Policies also include the relevant definitions:

SECTION III – DEFINITIONS

\*    \*    \*

I.    OCCURRENCE means an accident including continuous or repeated exposure to substantially the same general harmful conditions.

\*    \*    \*

M.    OTHER INSURANCE means insurance, other than UNDERLYING INSURANCE, which has been provided to YOU and affords coverage with respect to injury or damage to which this policy also applies.

N.    PERSONAL INJURY means:

1.    Bodily injury, sickness or disease sustained by a person including death resulting from any of these at any time;

O.     POLICY PERIOD means the period stated in the Declarations of this policy.

\*     \*     \*

Q.     PRODUCTS – COMPLETED OPERATIONS HAZARD includes:

    1.     All PERSONAL INJURY and PROPERTY DAMAGE occurring away from premises YOU own or rent and arising out of YOUR PRODUCT or YOUR WORK except:

       a.     products that are still in YOUR physical possession;

       b.     work that has not yet been completed or abandoned.

\*     \*     \*

T.     SUIT means a civil proceeding in which damages to which this policy applies are alleged.

\*     \*     \*

U.     ULTIMATE NET LOSS means the amount of the principal sum, award or verdict actually paid or payable in cash in the settlement or satisfaction of claims for which the INSURED is liable, either by adjudication or compromise with the written consent of US, after making proper deduction for all recoveries and salvages.

V.     UNDERLYING INSURANCE means the policy or policies of insurance as described in the Schedule of Underlying Insurance forming a part of this policy.

\*     \*     \*

Y.     YOUR PRODUCT means:

    1.     Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed by:

       a.     YOU;

- 7 -

      b.     Other trading under YOUR name; or

      c.     A person or organization whose BUSINESS or assets YOU have acquired; and

2.     Containers (other than vehicles), materials, parts, or equipment furnished in connection with such goods or products.

YOUR PRODUCT includes warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of YOUR PRODUCT; and the providing of or failure to provide warnings or instructions.

YOUR PRODUCT does not include vending machines or other property rented to or located for the use of others but not sold.

In addition, the TIG Excess Policies contain the following relevant conditions:

SECTION IV – CONDITIONS

\*     \*     \*

F.     DUTIES IN THE EVENT OF OCCURRENCE, CLAIM OR SUIT

1.     YOU must see to it that WE receive prompt written notice of an OCCURRENCE which may result in a claim. Notice should include:

      a.     How, when and where the OCCURRENCE took place;

      b.     The names and addresses of any injured persons and witnesses.

2.     If a claim is made or SUIT brought against YOU, YOU must see to it that WE receive prompt written notice of the claim or SUIT.

3.     YOU and any other involved INSURED must:

      b.     Immediately send US copies of any demands, notices, summons or legal papers received in connection with the claim or SUIT;

      c.      Authorize US to obtain records or other information;

      d.      Cooperate with US in the investigation, settlement or defense of the claim or SUIT;

      e.      Assist US, upon OUR request, in the enforcement of any right against any person or organizations which may be liable to YOU because of injury or damage to which this policy may also apply.

4.      YOU shall not make or authorize in admission of liability or attempt to settle or otherwise dispose of any claim or SUIT without OUR written consent.

\*    \*    \*

I.      MAINTENANCE OF UNDERLYING INSURANCE

The policy or policies referred to in the Declarations and Schedule of UNDERLYING INSURANCE or renewals or replacements thereof not more restrictive in coverage shall be maintained in full effect during this POLICY PERIOD, except for any reduction in the aggregate limits solely by payment of claims and/or claims expense.

If such UNDERLYING INSURANCE is not maintained in full effect by YOU, or if any limits of liability of UNDERLYING INSURANCE are:

1.      less than as stated in the Schedule of UNDERLYING INSURANCE; or

2.      unavailable to YOU due to bankruptcy or insolvency of an underlying insurer; or

3.      if there is any material change in the coverage of any UNDERLYING INSURANCE;

Then the insurance afforded by this policy shall apply in the same manner as if such UNDERLYING INSURANCE and limits of liability had been in effect, available, so maintained and unchanged.

J.      OTHER INSURANCE

If OTHER INSURANCE, whether collectible or not, is available to YOU covering a loss also covered by this policy, other than a policy

that is specifically written to apply in excess of this policy, the insurance afforded by this policy shall apply in excess of and shall not contribute with such OTHER INSURANCE.

\*    \*    \*

**C.    Distribution of the Jiffy Air Profiler**

Upon information and belief, Fairchild purchased VSI Corporation in 1980. At the time of Fairchild's purchase, D-M-E Company ("D-M-E") was a division of VSI Corporation. Among other products, D-M-E distributed a reciprocating hand tool that was used in the mold and die industry and known as the Jiffy Air Profiler. Fairchild, through D-M-E, distributed the Jiffy Air Profiler from 1987 through 1996.

On January 23, 1996, Fairchild entered into an Asset Purchase Agreement with Milacron, Inc. ("Milacron") whereby Milacron purchased the assets of D-M-E. Thereafter, Milacron formed a free-standing corporation named D-M-E Company, which continued to distribute the Jiffy Air Profiler from 1996 through April 2004.

**D.    The Missouri Actions**

In January 2002, fourteen product liability actions were filed separately in the United States District Court for the Eastern District of Missouri, Eastern Division, naming D-M-E as the sole defendant (the "Missouri Actions"). The plaintiffs in the Missouri Actions alleged exposure to the Jiffy Air Profiler from approximately 1987 through 2003 and claimed that the product was defective because it subjected the user to dangerous and damaging levels of vibrations that resulted in personal injuries.

After litigating the Missouri Actions for over two years, on January 29, 2004, Milacron notified Fairchild of the Missouri Actions and sought defense and

indemnification pursuant to the Asset Purchase Agreement as well as statutory contribution.

From April 2004 through August 2004 a series of mediations took place in the Missouri Actions. Without Fairchild's participation, Milacron unilaterally settled all of the claims pending in the Missouri Actions for a total of $5.8 million.

### E.    The Milacron Action

On or about May 24, 2004, Milacron commenced a lawsuit captioned *Milacron, Inc., f/k/a Cincinnati Milacron v. The Fairchild Corporation and RHI Holdings, Inc.* (the "Milacron Action"), Case Number A0404162 in the Court of Common Pleas, Hamilton County, Ohio. See, Declaration of Kristin V. Gallagher dated January 7, 2008 ("Gallagher Declaration"), Exhibit "A". On or about October 19, 2004, Fairchild filed a Third-Party Complaint in the Milacron Action against its primary insurers, American International Group, Inc., National Union Fire Insurance Company of Pittsburgh, PA, Insurance Company of the State of Pennsylvania, Zurich American Insurance Company, Royal & SunAlliance USA and The Hartford Fire Insurance Company in the Milacron Action seeking a declaration as to insurance coverage. On October 16, 2006, a bench trial was held in the Milacron Action before the Honorable Steven E. Martin ("bench trial").

### F.    Notice to TIG

By correspondence dated December 1, 2006, and subsequent to the bench trial, Fairchild notified TIG of the Missouri Actions – almost three years after Fairchild received notice of the Missouri Actions. By correspondence dated December 29, 2006, TIG issued a complete reservation of rights with respect to coverage for the Missouri Actions and requested additional information from Fairchild to assist in its investigation of those

- 11 -

claims, including, but not limited to, copies of all pleadings referenced in Fairchild's December 1, 2006 correspondence.

Fairchild failed to provide the requested information to TIG until on or about July 24, 2007. In addition, Fairchild did not notify TIG of the Milacron Action until July 2007, more than a year and a half after Milacron filed that action against Fairchild.

## G.    Judgment in the Milacron Action

By letter dated July 12, 2007, Judge Martin issued a decision in the Milacron Action, finding that Fairchild owed Milacron statutory contribution for the settlements in the Missouri Actions and allocating such contribution pursuant to Milacron's proposed methodology, which held Fairchild 100% liable for the injuries sustained prior to 1997 (one year after the sale of D-M-E) and 50% liable for injuries sustained thereafter. See, Gallagher Declaration, Exhibit "B". Pursuant to the foregoing allocation model, Judge Martin proposed a total judgment against Fairchild in the amount of $3,346,346.13, plus prejudgment interest of $598,535.93, as well as post-judgment interest and court costs (the "Milacron Judgment"). For the period from January 1, 1990 through October 1, 1996, the court allocated a total contribution amount of $1,911,739.09.

Upon information and belief, the Milacron Judgment was to be entered on or about August 10, 2007.

## H.    TIG's Disclaimer of Coverage

By correspondence dated July 24, 2007, Fairchild demanded that TIG contribute a pro rata portion of the Milacron Judgment under the TIG excess policies. See, Gallagher Declaration, Exhibit "C". Specifically, Fairchild contended that the $1,911,739.09 judgment amount attributed to the January 1, 1990 through October 1, 1996 policy periods

should be allocated as follows: 1) $250,000 to Fairchild pursuant to its self-insured retention under the National Union Primary Policies; 2) $750,000 to National Union under its Primary Policies; and 3) $911,739.09 to Fairchild's excess carriers, including TIG. See, Gallagher Declaration, Exhibit "C".

Upon information and belief, Fairchild's request for contribution from Fairchild's excess carriers was based upon the assumption that the "Anti-Stacking Endorsement" in the National Union Primary Policies issued from January 1, 1990 through October 1, 1996 limited National Union's exposure during that time period to a single, $1 million per occurrence policy limit, which was subject to a self-insured retention of $250,000.

By correspondence dated July 24, 2007, TIG disclaimed coverage for the claims arising in the Missouri Action based upon Fairchild's failure to demonstrate that the limits of all underlying insurance and other insurance had been completely and properly exhausted. See, Gallagher Declaration, Exhibit "D". TIG further reserved its rights on a variety of other policy terms and conditions, including, but not limited to, Fairchild's failure to provide timely notice of the underlying claims to TIG and that TIG has no obligation to provide coverage for personal injury occurring before the inception or after the expiration of the TIG excess policies. See, Gallagher Declaration, Exhibit "D".

## I.    The New York Declaratory Judgment Action

On or about September 21, 2007, TIG commenced this action, seeking a declaration of its rights and obligations with respect to Fairchild pursuant to the TIG Excess Policies and the National Union Primary Policies as they relate to the Milacron Action. See, Gallagher Declaration, Exhibit "E".

J.    **The Ohio Declaratory Judgment Action**

Subsequent to the commencement of the present action, on or about September 27, 2007, Fairchild filed a second amended third-party complaint in the Milacron Action, naming TIG as a third-party defendant, and seeking a declaration of its rights under the TIG Excess Policies as they relate to the Milacron Action (the "Ohio Action"). See, Gallagher Declaration, Exhibit "F".

## II.    **LEGAL ARGUMENT**

Defendants have failed to establish that a dismissal or a stay of the present action is warranted due to the subsequent filing of the second third-party complaint in the Ohio Action.  As the action before this Honorable Court is one seeking a declaratory judgment, the applicable inquiry as to whether a dismissal or a stay should be granted in deference to a parallel state court proceeding is set forth in Wilton v. Seven Falls Co., 515 U.S. 277, 115 S.Ct. 2137 (1995), which is governed by the discretionary standard established in Brillhart v. Excess Ins. Co. of America, 316 U.S. 491, 62 S.Ct. 1173 (1942).  The application of abstention principles set forth in Colorado River Water Conservation Dist. v. U.S., 424 U.S. 800, 96 S.Ct. 1236 (1976) are therefore not applicable in this particular kind of action and Fairchild's reliance on the same is misplaced.  Nevertheless, TIG will demonstrate that even if the Colorado River analysis was applied herein, the "exceptional circumstances" required for a dismissal or a stay are not present.  TIG urges that this Court properly exercise its broad discretion by entertaining this declaratory action and denying Defendants' motion in its entirety.

**A.**    **A Dismissal or Stay is Not Warranted Under *Wilton*.**

As noted above, the decision in Wilton is controlling in this instance. See, Moses H. Cone Memorial Hosp. v. Mercury Const. Corp., 460 U.S. 1 (1983) (rejecting Brillhart's application beyond the context of declaratory judgments); Youell v. Exxon Corp., 74 F.3d 373, 375 (2d Cir., 1996); Manna v. Greenburgh #11 School Dist., 2 F.Supp.2d 461, 467 (S.D.N.Y., 1998); Caisse Nationale de Credit Agricole v. Bank of Tokyo-Mitsubishi Trust Co., 1997 WL 345216, * 4 (S.D.N.Y., 1997). Indeed, the Second Circuit Court of Appeals has held that Wilton will not apply where a plaintiff does not seek "purely declaratory relief." Village of Westfield v. Welch's, 170 F.3d 116, 124-25 n. 5 (2d Cir., 1999). Here, TIG seeks a declaration as to its rights and obligations with respect to the interpretation of the Anti-Stacking Endorsement of the National Union policies. Citing Brillhart, the court in Wilton found that the proper inquiry for a court faced with a suit brought under the Declaratory Judgment Act was whether the questions in controversy in the federal action, which are not foreclosed under the applicable substantive law, can be better settled in the proceeding that is pending in the state court. Wilton, 515 U.S. at 282. Brillhart also set forth a list of factors to be considered that, while not exhaustive, are certainly instructive.

> [S]ome of the factors to be considered include: (1) whether the state and federal actions are parallel; (2) the scope of the state court proceeding; (3) the nature of the defenses available in state court; (4) whether the necessary parties have been joined; (5) whether the claims of all parties in interest can be adjudicated in the state court; (6) the order of filing; and (7) the choice of law.

Allstate Ins. Co. v. Valley Physical Medicine & Rehabilitation, P.C., 475 F.Supp.2d 213, 233-234 (E.D.N.Y., 2007) *citing* Brillhart, 316 U.S. at 495.

Applying the initial inquiry to the action *sub judice*, TIG respectfully submits that it is clear that the issue presented herein – the application and interpretation of the National Union policies' Anti-Stacking Endorsement – can <u>not</u> be "better settled" in the Ohio Action. Although Defendants argue that this action does not include all necessary parties, the Ohio Action includes multiple plaintiffs and defendants and a host of issues that are immaterial to the sole issue before this Court. Here, the sole issue relevant to TIG's rights and obligations is whether the National Union policies' Anti-Stacking Endorsement applies to limit Fairchild's recovery from National Union to only one policy limit. The only interested and necessary parties to this controversy are TIG, Fairchild and National Union.

Therefore, while this action and the Ohio Action are parallel, and TIG concedes that all relevant defenses are also available and may be asserted in the state court, to force TIG to litigate this issue in the Ohio Action instead would be extremely burdensome. Due to the nature of the Ohio Action and the number of litigants involved, TIG would become engulfed in extraneous litigation that would subject it to unnecessary and unreasonable litigation costs. Indeed, were this Court to retain jurisdiction over this matter, the same could be efficiently and economically resolved, as the only entities interested in the outcome are parties to the action herein.

Finally, TIG filed this declaratory action almost one week prior to the filing of the Ohio Action. While "[t]he federal declaratory judgment is not a prize to the winner of a race to the courthouses" [Pro-Fac Co-op, Inc. v. Alpha Nursery, Inc., 205 F.Supp.2d 90, 104 (W.D.N.Y., 2002) (citations omitted)], TIG respectfully submits that deference should be given to the action that was commenced first in time. To dismiss or stay this action in favor of the later filed Ohio Action could potentially establish a precedent that would

weaken diversity jurisdiction whereby any party wishing to avoid the federal forum could file a subsequent declaratory action in state court, thereby providing the district court with grounds for abstention.

It is therefore respectfully submitted that Defendants have failed to establish that a dismissal or a stay is warranted under the holding in <u>Wilton</u>. TIG prays that this Honorable Court exercise its broad discretion by denying Defendants' motion in its entirety and that it retain jurisdiction over the matter *sub judice*.

**B.    Abstention is Not Warranted Under *Colorado River*.**

Although the analysis applied in <u>Colorado River</u>, 424 U.S. 800 (1976), does not pertain to actions that purely seek declaratory relief, in the event that this Court applies the abstention principles set forth therein, TIG contends that Defendants have still failed to demonstrate their entitlement to an order of abstention.

"Abstention from the exercise of federal jurisdiction is the exception, not the rule." <u>Id</u>. at 813.  Furthermore, "it was never a doctrine of equity that a federal court should exercise its judicial discretion to dismiss a suit merely because a State court could entertain it."  <u>Alabama Pub. Serv. Comm'n. v. Southern R. Co.</u>, 341 U.S. 341, 361 (1951) (Frankfurter, J., concurring in result).  Indeed, "[g]enerally, as between state and federal courts, the rule is that 'the pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction . . . .'" <u>Colorado River</u>, 424 U.S. at 817 (citations omitted).  The <u>Colorado River</u> court found three general categories where the circumstances were appropriate for abstention: where a case presented a federal constitutional issue that might be mooted by a state court determination of state law; where difficult questions of state law bearing on policy problems of substantial public

import are presented; and where federal jurisdiction has been invoked for the purpose of restraining state criminal proceedings. Id. at 814-816. Here, none of those circumstances are present.

Moreover, when considering abstention, "a district court is required to weigh numerous factors, with the balance 'heavily weighted in favor of the exercise of jurisdiction'." General Star Int'l. Indem. Ltd., v. Chase Manhattan Bank, 2002 WL 850012, * 6 (S.D.N.Y., 2002) (citation omitted). Indeed, "the purpose of the test is to ascertain whether 'exceptional circumstances' exist to justify the surrender of federal jurisdiction, the facial neutrality of one factor is a basis for retaining jurisdiction, not for yielding it." Id. Although not exhaustive, the following factors are considered especially significant: (1) the assumption of jurisdiction by either court over any res or property; (2) the inconvenience of the federal forum; (3) the avoidance of piecemeal litigation; (4) the order in which jurisdiction was obtained; (5) whether state or federal law supplies the rule of decision; and (6) whether the state court proceeding will adequately protect the rights of the party seeking to invoke federal jurisdiction.

Here, the issue in question does not involve a res. "[A]bsence of a res 'point[s] toward exercise of federal jurisdiction.'" Village of Westfield v. Welch's, 170 F.3d 116, 122 (2d Cir., 1999) (citations omitted). As such, this factor weighs against the issuance of a stay.

In addition, contrary to Defendants' assertions, the Southern District of New York is not an inconvenient forum for any of the parties to this action. In fact, it is quite the opposite, as neither Fairchild nor TIG reside in Ohio. Indeed, Fairchild is a Delaware corporation with its principal place of business in McLean, Virginia, which is half as far

from the Southern District of New York as it is from Hamilton County, Ohio.  National

Union would also benefit by litigating this matter in New York, which is its state of

residency.    Therefore, maintaining this action would be more expeditious and less

expensive than litigating in Ohio.  In fact, both the TIG Excess Policies and the National

Union Primary Policies were issued to Fairchild from the respective insurers New York,

New York offices through New York insurance brokers.  As a result, the only potential

witnesses will be the parties' own representatives, most of whom are located in New York.

It is clear that New York is the more convenient forum for adjudication of the action *sub*

*judice* and this factor also weighs against an issuance of a stay.  Indeed, "where the federal

court is 'just as convenient' as the state court, that factor favors retention of the case in

federal court".  Id. (citations omitted).

     As to the avoidance of piecemeal litigation, the Supreme Court acknowledged that

"the mere potential for conflict in the results of adjudications, does not, without more,

warrant staying exercise of federal jurisdiction."  Colorado River, 424 U.S. at 816.  This

Court itself noted that

> any case involving parallel proceedings presents a risk of
> duplicative litigation or a rush to judgment, the existence of
> those risks can weigh only modestly in favor of dismissal;
> otherwise dismissals pursuant to Colorado River would be
> the rule, not the exception in cases involving parallel
> proceedings in state and federal court.

In re Asbestos Litig., 963 F.Supp. 247, 253 (S.D.N.Y., 1995) (citations omitted).  Here,

Defendants argue that only the Ohio Action includes all necessary claims and parties and

that the advanced state of the Ohio Action favors abstention.  TIG contends, however, that

with regard to the specific, limited issue before this Honorable Court, Fairchild and

National Union are the only interested parties that will be affected by any decision rendered

in favor of TIG.  Thus, there is no danger of piecemeal litigation, as the other defendants in the Ohio Action would not be affected by any judgment rendered by this Court.

Further, although this action does not involve federal questions of law, the absence of federal issues "does not strongly advise dismissal, unless the state law issues are novel or particularly complex."  Village of Westfield v. Welch's, 170 F.3d at 124.  Here, the state law issue involves the application and interpretation of the Anti-Stacking Endorsement in the National Union policies.  Given that the courts are inundated with multitudes of cases related to insurance coverage, it is respectfully submitted that the issue at bar is common place and not "novel or particularly complex".

Finally, federal courts must determine whether the "parallel state-court litigation will be an adequate vehicle for the complete and prompt resolution of the issues between the parties."  Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp., 460 U.S. 1, 28 (1983).  Indeed, "[i]f there is any substantial doubt as to this, it would be a serious abuse of discretion to grant the stay or dismissal at all."  Id.  Considering the length of the litigation in the Ohio Action, which has been pending before that court for over three years, it cannot be assumed that the Ohio Action is the adequate vehicle for the "prompt resolution" of the issue herein, especially considering the number of additional litigants involved therein.  This factor also weighs against a stay or a dismissal of the present action.

The Second Circuit noted that "a district court's discretion to abstain must be exercised within 'the narrow and specific limits' prescribed by the particular abstention doctrine involved."  Westfield, 170 F.3d at 125.

## CONCLUSION

Based on the foregoing arguments, abstention or a dismissal is not warranted pursuant to Colorado River, and it is respectfully requested that Defendants' motion be denied in its entirety.

Dated: New York, New York
       January 9, 2008

                              Respectfully submitted,

                              CARROLL, McNULTY & KULL L.L.C.

By:                          
                              Kristin V. Gallagher [KV 6810]
                              Eileen de Callies [ED 2938]
                              570 Lexington Avenue
                              New York, NY 10022
                              (212) 252-0004
                              *Attorneys for Plaintiff TIG Insurance*
                                *Company*